| | |
|---|---|
| 1 | KAREN P. HEWITT |
| | United States Attorney |
| 2 | REBECCA S. KANTER |
| | Assistant U.S. Attorney |
| 3 | California State Bar. No. 230257 |
| | LAWRENCE A. CASPER |
| 4 | Assistant U.S. Attorney |
| | California State Bar No. 235110 |
| 5 | Federal Office Building |
| | 880 Front Street, Room 6293 |
| 6 | San Diego, California 92101-8893 |
| | Telephone: (619) 557-6747 |
| 7 | |
| | Attorneys for Plaintiff |
| 8 | UNITED STATES OF AMERICA |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Crim. Case No. 07cr2956-LAB |
|---|---|
| Plaintiff | |
| v. | GOVERNMENT'S MOTION FOR INQUIRY INTO POTENTIAL CONFLICT OF INTEREST |
| STEPHEN RHETT (1), | |
| Defendant. | |

Comes now plaintiff the United States of America, by and through its counsel, Karen P. Hewitt, United States Attorney, Rebecca S. Kanter, Assistant United States Attorney, and Lawrence A. Casper, Assistant United States Attorney, and hereby files this Motion for Inquiry into Potential Conflict of Interest and Memorandum of Points and Authorities in support thereof.

//

//

//

//

I.

INTRODUCTION

A.   STATEMENT OF THE CASE

On October 30, 2007, a federal grand jury returned a two-count Indictment charging Defendants Stephen Francis Rhett and Janet Bernice Forbes with: (1) importing approximately 508.10 kilograms (1117.82 pounds) of marijuana, in violation of 21 U.S.C. §§ 952 and 960, and (2) possessing with intent to distribute that same amount of marijuana, in violation of 21 U.S.C. § 841(a)(1).  Defendants entered not guilty pleas before the Magistrate Judge on that same day.

B.   STATEMENT OF FACTS

1.   Primary Inspection: Defendant Rhett's Nervousness

On September 23, 2007, at approximately 10:20 p.m., Defendants Stephen Francis Rhett (Rhett) and Janet Bernice Forbes (Forbes) entered the United States from Mexico through the San Ysidro Port of Entry in a white 1999 Ford F-250 with California license plate (3QOS602) towing a trailer also bearing California license plates (4JL1558).  Defendant Rhett was the driver and Defendant Forbes was the front seat passenger.

At primary inspection, Defendant Rhett told Customs and Border Protection Officer (CBPO) Fontanilla that they were not bringing anything from Mexico, that they went to Mexico to deliver building materials as donations to Mexico, and that the "trailer is empty now."  At CBPO Fontanilla's request, Rhett opened the trailer.  Upon entering the trailer, CBPO Fontanilla noticed a new plywood floor in the trailer.  CBPO Fontanilla tapped the floor with his flashlight and it sounded soft but solid.  He also noticed that the underside of the floor appeared to have a space discrepancy.  CBPO Aguilar followed CBPO Fontanilla to back him up at the rear of the trailer. CBPO again asked Defendant Rhett what he was bringing back from Mexico.  Rhett responded, "Nothing, sir, is there any problem?"  CBPO Aguilar began to unscrew one screw on the floor, pried the corner of the floor and noticed a space discrepancy and discovered blue packages.  While CBPO Aguilar was removing one of the wooden floor panels, he noticed Defendant Rhett become

1  so nervous that he proceeded to defecate on himself. Defendants Rhett and Forbes were escorted
2  to the security office and the vehicle and trailer were driven to secondary for further inspection.

3

4          2.        <u>Secondary Inspection: Discovery of 508.10 Kilograms of Marijuana</u>

5  Upon further examination by CBPO Everett and her narcotics detector dog, the dog alerted
6  to the presence of a narcotics odor coming from the rear bumper area of the trailer. Upon
7  secondary inspection by CBPO John Tobin, he observed that there were three saw horses, clothes
8  and a case of water in the trailer. He also observed that the flooring was clean. CBPO Tobin
9  unscrewed the flooring and lifted it to reveal the compartment and observed packages. CBPO
10 Tobin probed one package, which field tested positive for marijuana. Defendants were then placed
11 under arrest. A total of 108 packages were then removed from the vehicle and 508.10 kilograms
12 of marijuana (approximately 1117.82 pounds) were seized.

13         3.        <u>Defendant Stephen Rhett's Post-Miranda Statement</u>

14 At approximately 1:00 a.m. on September 24, 2007, Defendant Rhett was read his <u>Miranda</u>
15 warnings, acknowledged his understanding, waived them orally and in writing and then provided
16 a videotaped statement to ICE Special Agent Daniel Duff; the statement was witnessed by ICE
17 Special Agent Christian Alva. Defendant claimed that he was approached on the streets by "Jen,"
18 and "Robert" who claimed to be from First Presbyterian Church in San Diego. Rhett claimed that
19 they offered him $100 each way to transport building materials to Tijuana, Mexico. Rhett stated
20 that he agreed to transport the materials for payment.

21 Defendant Rhett claimed he received the F-250 and trailer at the First Presbyterian
22 somewhere in downtown San Diego but claimed he could not recall the address or location. Upon
23 receiving the truck, Rhett claims he drove directly into Mexico where he met with an unknown
24 man, whom he followed to the "Flamingo Hotel" in Tijuana. Rhett claimed he stayed the night in
25 the hotel and met with "Jen" and a Hispanic female, whom he identified as "Silvia", the following
26 morning at approximately 6:00 a.m. On the morning of his arrest, Defendant Rhett met with

27

28                                       3                07cr2956-LAB

1  "Felipe" who is the father of "Jen." Rhett claimed "Felipe" offered him $2,000 to smuggle four undocumented aliens into the United States.

Rhett stated that, after crossing the border, he was to drive the vehicle and trailer to Temecula and park them at a gas station parking lot off of the I-15 and California Oaks. Rhett claimed he did not know his passenger. He claimed to have observed the trailer get loaded and unloaded with building materials. Rhett admitted he was suspicious but denied having knowledge of the marijuana in the trailer. "Jen's" direct connect telephone number was obtained from Defendant Rhett's cellular telephone. The interview concluded at approximately 1:54 a.m., after Rhett requested to consult with an attorney.

4.  <u>Defendant Janet Bernice Forbes' Post-Miranda Statement</u>

At approximately 3:00 a.m. on September 24, 2007 Defendant Janet Bernice Forbes was interviewed in English by ICE Special Agent Duff and witnessed by Special Agent Alva. Defendant was read her <u>Miranda</u> rights in English, acknowledged she understood her rights and waived them orally and in writing before providing a videotaped statement.

Forbes stated that she was on methadone for heroin addiction and that she frequents Tijuana often to receive her methadone treatments. She claimed that, on the morning of her arrest, she went to Tijuana, Mexico to receive one of her treatments. She stated that, after receiving her treatment, she was approached by "Felipe," who offered to pay her $500 to be a passenger in a vehicle that was to cross illegal aliens into the United States. She stated that she was picked up by a taxi and driven to a house in Colonia Libertad, Tijuana, Mexico. Upon her arrival, she observed approximately six to eight people and met Defendant Rhett there. She stated that she spent approximately twenty minutes at the house and then left with Rhett and an unknown Hispanic male named "Jimmy." She stated that they traveled approximately 10-15 minutes to a gas station possibly in Rosarito, Mexico, where the white F-250 and trailer were located. Forbes stated that Defendant Rhett told her he had made seven previous trips across the border but that this was his first time working for this family.

4                               07cr2956-LAB

1   Upon receiving the F-250 and trailer, Rhett got into the vehicle with her and "Jimmy"; "Jimmy" rode with them for a little while until "Jimmy" told Rhett that it was time for "Jimmy" to get out. Forbes stated that Defendant Rhett was receiving numerous Nextel calls from a woman identified as "Jen." Forbes said "Jen" was requesting that Rhett call her back after they crossed the border. While they were in line to enter the United States at the port of entry, "Jen" was calling Rhett every two minutes. She also claimed to have heard "Jen" tell Rhett that he needed to move over a few lanes to cross or they would be sent to secondary; they were, however, unable to change lanes because of the trailer. Forbes said that Rhett told her that the previous time he crossed he needed help from the previous female passenger to lower the trailer gate.

Defendant Forbes claimed she thought she was transporting undocumented aliens and believed she would receive her $500 payment in Mexico. She denied knowledge of the marijuana and the interview concluded at approximately 4:00 a.m.

C.   OTHER CASES

1.   United States v. David Horton Brown, 07cr0923-W

David Horton Brown was arrested on March 5, 2007 at the San Ysidro Port of Entry as the driver and sole occupant of a Chevy 1-ton step van towing a 20-foot utility trailer containing approximately 1,147.90 kgs of marijuana. In his post-arrest statement, Defendant stated that he was hired by "Felipe" to smuggle illegal aliens into the United States. On January 3, 2008, Brown pled guilty to knowingly importing marijuana. Although Brown is currently represented by Frank Sanchez, he was previously represented by Stephen Demik of Federal Defenders of San Diego, Inc. Mr. Demik was relieved from the case by Magistrate Judge Jan M. Adler due to a conflict issue.

2.   United States v. Thomas Dolan, 07cr0928-BEN

Thomas Dolan was arrested on February 11, 2007 at the Andrade Port of Entry as the passenger of a 2002 ford F-350 pick-up truck pulling a recreation trailer containing 1,246.67 kgs of marijuana. In his post-arrest statement, Defendant claimed that he was hired by "Felipe" to smuggle illegal aliens into the United States and denied knowledge of the marijuana in the vehicle.

1  On October 18, 2007, Dolan pled guilty to knowingly importing marijuana. Although Dolan is currently represented by Stephen White, he was previously represented by Jason Ser of Federal Defenders of San Diego, Inc. Mr. Ser was relieved from the case by Magistrate Judge Jan M. Adler due to a conflict issue.

II.

ARGUMENT

A.   JUDICIAL INQUIRY INTO CONFLICTS OF INTEREST

1.   Potential Attorney Conflicts Must Be Raised and Explored

The government has a duty to inform the Court of potential attorney conflicts promptly, to allow the Court to satisfy its duty to resolve such issues at the earliest possible stage. United States v. Tatum, 943 F.2d 370, 379-80 (4th Cir. 1991) ("[W]hen a conflict situation becomes apparent to the government, the government has a duty to bring the issue to the court's attention;" "When the risk of a conflict of interest is brought to the attention of the trial court, ... the court has the responsibility to investigate further, to advise the defendant personally, and to receive a knowing waiver if that is the expressed wish of the defendant;"); Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 1261 (2002) (Souter, J., dissenting) ("[T]he accepted view that a trial judge placed on notice of a risk of prospective conflict has an obligation then and there to do something about it" is "too clear for cavil"); United States v. Alberti, 470 F.2d 878, 881-82 (2d Cir. 1972); *cf.* Fed. R. Crim. P. 44(c).

The government has very recently become aware that there might be a potential conflict in Ms. Betancourt's continued representation of Defendant Rhett in this case. The Government has notified Ms. Betancourt of the potential conflict issue. *See* Exhibit A. At this time, the Government understands that Ms. Betancourt's position is that there is no conflict of interest. The Government, nonetheless, is obligated to inform the Court of the potential conflict in order to give the Court the opportunity to inquire into the potential conflict and obtain a waiver of any potential conflict, if necessary. *See, e.g.,* United States v. Shwayder, 312 F.2d 1109, 1117 (9th Cir. 2002)

(disregarding waiver obtained by defense counsel but never inquired into by court); United States v. Martinez, 143 F.3d 1266, 1269 (9th Cir. 1998).

### 2. Ethics Concerns Take Precedence Over Defendant's Choice of Counsel

The Sixth Amendment guarantees a criminal defendant "the right ... to have the Assistance of Counsel for his defense." The "essential aim" of the right to counsel "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988).

The right to counsel of one's choice is a corollary to the right to effective representation, "circumscribed" by competing concerns such as the interest "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 159-60; cf. People v. Speedee Oil Change Systems, Inc., 20 Cal.4th 1145 (1999) ("The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our litigation process."). The court's interest in maintaining high ethical standards in its bar is an independent and adequate justification for disqualification of an attorney, even in a criminal case. United States v. Snyder, 707 F.2d 139, 145 (5th Cir. 1983). As the Supreme Court stated in Wheat:

> [W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform within the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant['s] comprehension of the waiver.

Wheat, 486 U.S. at 162 (quoting United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir. 1978)).

### 3. The Court Has Broad Discretion In Deciding These Matters

A defendant's choice of counsel should be given substantial weight, but the Court has broad latitude to exercise its discretion to evaluate a defendant's choice. District courts have "substantial

latitude in refusing waivers of conflicts of interest, not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as trial progresses." Wheat, 486 U.S. 163-164 ("The District Court must recognize a presumption in favor of [defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of serious potential for conflict. The evaluation of the facts and circumstances of each case must be left primarily to the informed judgment of the trial court.").

### 4. Potential Conflicts Are Raised As A Result Of Defense Counsel's Former Representation of Aguilar

As this Court has adopted both California and ABA rules of professional ethics, not only the Sixth Amendment but also those ethics rules apply in determining the conflicts presented. *United States v. Mett*, 65 F.3d 1531, 1537 (9th Cir. 1995); CivilLR 83.4 (incorporated into Criminal Rules by CrimLR 8.1(e)). Because Federal Defenders is no longer representing either Brown or Dolan, the primary potential conflict presented by the facts of this case is the successive representation of Defendant Rhett after representing Brown and Dolan in other cases.

Successive representation occurs where an attorney representing a defendant has previously represented witnesses that could incriminate the defendant. *See* Mannhalt v. Reed, 847 F.2d 576, 580 (9th Cir. 1988). Successive representation of conflicting interests strain an attorney's duties of loyalty and confidentiality to succeeding sets of clients. United States v. Shwayder, 312 F.3d 1109, 1117 (9th Cir. 2002). Of particular concern is the possibility that an attorney may use privileged information learned from one client in the service of the next, or just the opposite, fail to pursue a line of inquiry with adequate zeal for fear of misusing confidential information of the former client. Id. at 1118.

When the subject matter of a former representation is "substantially related" to a later representation, California courts "will conclusively presume that the attorney possesses confidential information adverse to the former client and order disqualification." Henriksen v. Great American Savings & Loan, 11 Cal. App. 4th 109, 114 (1992); *see also* Shwayder, 312 F.3d

at 1118 (finding actual conflict in defense counsel's former representation of government trial witness). Cases are "substantially related" if "the factual contexts of the two representations are similar or related." Trone v. Smith, 621 F.2d 994, 998 (9th Cir. 1980). "If there is a reasonable probability that confidences were disclosed which could be used against the former client in the later adverse representation, moreover, a substantial relationship between the two cases will be presumed." Thomas v. Municipal Court, 878 F.2d 285, 288 (9th Cir. 1989).

The prohibition against successive representation avoids placing counsel in the untenable position of opposing a former client about the very subject of the previous representation. As the Ninth Circuit has explained when upholding a district court's disqualification decision, counsel cannot live up to his ethical duties when placed in this situation: "[The attorney] could thus have been faced with either exploiting his prior, privileged relationship with the witness or failing to defend his present client zealously for fear of misusing confidential information." United States v. Baker, 10 F.3d 1374, 1399 (9th Cir. 1993), overruled on other grounds, United States v. Nordby, 225 F.3d 1053 (9th Cir. 2000). This is particularly true where a former client may become subject to cross-examination by his attorney in the trial of the attorney's current client. *See* Fitzpatrick v. McCormick, 869 F.2d 1247, 1252 (9th Cir. 1989) ("Among the dangers in a successive representation situation is that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination for fear of misusing that confidential information." ). The Supreme Court and the other courts of appeals have held that a district court must prevent the possibility of a defense counsel being forced to cross-examine a former client. *See, e.g.*, Wheat, 486 U.S. at 164 (holding that defense counsel, "because of his prior representation of [the Government witness], would have been unable ethically to provide that cross-examination" of the Government witness); Stites, 56 F.3d at 1025 (upholding disqualification of attorney because "[s]he was bound by her duty to her former client not to enter into a relation where she would, almost by necessity, have to draw on knowledge she had obtained in the earlier relationship"); United States v. Wheat, 813 F.2d 1399, 1402 (9th Cir. 1987), aff'd, 486 U.S. 153

1  (1988) (attorney disqualified because he "could have misused those communications in cross-examining" his former clients, now Government witnesses); Henke, 222 F.3d at 636-38 (Ninth Circuit reverses conviction because defense counsel could not ethically cross-examine Government witness who formerly belonged to joint defense agreement with defense counsel); United States v. Kelly, 870 F.2d 854, 857 (2d Cir. 1989) (holding that defense counsel needed to conduct vigorous cross-examination of Government witness, and that prior representation of that witness prevented that from occurring); United States v. Moscony, 927 F.2d 742, 747-48 (3d Cir. 1991) (upholding disqualification because defense counsel could not zealously represent current client through cross-examination and maintain confidences of former client); United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir. 1978) ("DeLuca, as Dolan's lawyer, could not effectively cross-examine his former client, Garofolo, now an important prosecution witness without intruding into matters protected by the attorney-client privilege."). [1]

The Government is concerned that the potential exists that Brown or Dolan, former Federal Defender clients in other cases, might be called as witnesses against Defendant Rhett. As

---

[1] *See also, e.g.*, United States v. Vasquez, 995 F.2d 40, 42 (5th Cir. 1993) (defense counsel disqualified because he could not effectively cross-examine Government witness, who was former client); United States v. Locascio, 6 F.3d 924 (2d Cir. 1993) (disqualification based upon prior representation of a Government witness); United States ex rel. Stewart on Behalf of Tineo v. Kelly, 870 F.2d 854 (2d Cir. 1989) (disqualification based upon prior representation of Government informant); United States v. Agosto, 675 F.2d 965, 971 (8th Cir. 1982) (successive representation is problematic because "the attorney may be tempted to use that confidential information to impeach the former client" or "counsel may fail to conduct a rigorous cross-examination for fear of misusing his confidential information."), abrogated on other grounds, Flannigan v. United States, 465 U.S. 259 (1984); United States v. Stout, 723 F. Supp. 297, 311 (E.D. Penn. 1989) ("There is no question that [the attorney's] continued participation in this case poses a substantial threat to the defendant's right to a fair trial because of the serious possibility that his cross-examination of Government witnesses will be limited by the constraints [concerning the disclosure of confidential information of former clients]"); United States v. Culp, 934 F. Supp. 394, 398 (M.D. Fl. 1996) (disqualifying counsel and recognizing that "[t]he ethical canons thus present the lawyer with a Hobson's choice: the lawyer must either seek to elicit confidential information from the former client, or refrain from vigorous cross-examination . . . representation under such circumstances is inherently suspect."); United States v. Siegner, 498 F. Supp. 282, 285-88 (E.D. Penn. 1980) (upholding disqualification of counsel due to successive representation).

1    described above, Defendant Rhett claimed post-arrest that he was solicited to smuggle aliens.
2    Although he claims he declined the offer to smuggle aliens, the Government believes Defendant
3    Rhett may try to offer evidence at trial that he lacked requisite knowledge of the narcotics because
4    he believed that, if he was smuggling anything, it was only aliens.  If in fact Defendant Rhett raises
5    such a defense at trial, it is possible that the Government could call either Brown or Dolan to
6    testify at the trial as to what they were told by Felipe and why, despite initially claiming to have
7    been hired to smuggle aliens, they ultimately pled guilty to knowingly importing narcotics.  This
8    clearly raises the specter of Ms.  Betancourt cross-examining one of her office's former clients.
9    *See, e.g.*, Wheat, 486 U.S. at 155 (noting that where the District Court had not yet accepted the plea
10   and sentencing arrangement, a potential conflict exited because another individual, who had been
11   represented  by the same attorney, might be called as a witness in a trial against the defendant
12   regarding defendant's participation in the drug distribution scheme.)  The Government assumes,
13   without being privy to the conversations between Federal Defenders and Brown or Dolan, that
14   Federal Defenders obtained confidential information in the course of vigorously representing its
15   clients' interests.  *See, e.g.,* United States v. Perillo, 205 F.3d 775, 778-80 (5th Cir. 2000)
16   (discussing substantial relationship test; rejecting as "incredible" attorney's testimony that he had
17   learned no confidential information from representation of former client). Ms.  Betancourt is
18   imputed to have gained that knowledge.  *See* United States v. Ross, 33 F.3d 1507, 1523 (11th Cir.
19   1994) ("[I]f one attorney in a firm has an actual conflict of interest, we impute that conflict to all
20   attorneys in the firm, subjecting the entire firm to disqualification." ); *see also* United States v.
21   Stansfield, 874 F. Supp. 640, 645 (M.D. Penn. 1995) ("For purposes of conflicts of interest and the
22   constitutional and ethical concerns they entail, a law firm is regarded as one lawyer.").

23           This conflict merits a specific inquiry into whether Defendant Rhett can knowingly and
24   voluntarily waive his right to conflict-free counsel.  The Court must also inquire whether Brown
25   and Dolan can waive their right of confidentiality to allow Ms.  Betancourt to utilize in cross-
26
27
28                                                    11                              07cr2956-LAB

examination any information obtain in confidentiality by Federal Defenders during their representation of Brown and Dolan.

If the Court finds that there is a potential conflict, it should seek to determine whether such a conflict can be waived. Although the Court must try to balance these concerns with a defendant's right to choose his attorney, the Court should be cautious in fashioning a resolution to this issue. The Ninth Circuit has rejected an attorney's attempts to sidestep a conflict by cross-examining his prior clients without relying upon the confidential information, as any cross-examination raises "the possibility of an unwitting disclosure of confidential communications." Baker, 10 F.3d at 1399. See also Stites, 56 F.3d at 1020 (upholding Judge Keep's decision to reject defense counsel's "Chinese wall" explanation because the arrangement was "an unusual arrangement, almost impossible to monitor," as "[t]he Chinese wall might have crumbled"); Calabria, 614 F. Supp. at 193 (refusing to accept defense counsel's predicted limits on cross-examination of former client because trials are unpredictable and the tactic "puts the lawyer's concerns ahead of the defendant's needs and then shapes the defendant's needs to eliminate the attorney's problems created by a direct conflict of interest"). If the court determines that the conflict can be waived, the Court must ensure on the record that the waiver is knowing and voluntary. *See, e.g.,* United States v. Curcio, 680 F.2d 881 (2d Cir. 1982) (setting forth a procedure for conducting such a conflicts hearing.)

### III.
### CONCLUSION

For the reasons stated above, the Government asks that the Court make appropriate inquiry and rulings on the conflicts of interest faced by defendant Rhett's counsel.

Dated: January 3, 2008              Respectfully submitted,

                                    KAREN P. HEWITT
                                    United States Attorney

                                    s/ Rebecca Kanter

1
2
                                        REBECCA S. KANTER
                                        Assistant U.S. Attorney

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 07cr2956-LAB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| | ) | |
| STEPHEN FRANCIS RHETT (1), | ) | |
| | ) | |
| Defendant. | ) | |

IT IS HEREBY CERTIFIED THAT:

I, REBECCA S. KANTER, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of **GOVERNMENT'S MOTION FOR INQUIRY INTO POTENTIAL CONFLICT OF INTEREST** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Michelle Betancourt
2. Marc X. Carlos

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

None

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2008.

s/ Rebecca Kanter

REBECCA S. KANTER